IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

**KEITH WARNER**                                                                                          **PLAINTIFF**

V.                          NO. 4:21CV00270 KGB-PSH

**KILOLO KIJAKAZI,
ACTING COMMISSIONER of the
SOCIAL SECURITY ADMINISTRATION**[1]                        **DEFENDANT**

### RECOMMENDED DISPOSITION

This Recommended Disposition (Recommendation) has been sent to United States District Judge Kristine G. Baker. Either party may file written objections to this Recommendation. If objections are filed, they should be specific and should include the factual or legal basis for the objection.

To be considered, objections must be received in the office of the Court Clerk within 14 days of this Recommendation. If no objections are filed, Judge Baker can adopt this Recommendation without independently reviewing the record. By not objecting, parties may also waive the right to appeal questions of fact.

I.   **Introduction**:

Plaintiff, Keith Warner, applied for Title II disability and disability insurance

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of the Social Security Administration and is substituted as the Defendant in this action. Fed. R. Civ. P. 25(d).

1

benefits on September 1, 2015. (Tr. at 135). He also filed an application for Title XVI supplemental security income on September 30, 2015. *Id*. In both applications, Mr. Warner alleged disability beginning on January 1, 2013. *Id*. After conducting a hearing on December 11, 2017, an Administrative Law Judge ("ALJ") denied both applications. (Tr. at 148). The Appeals Council remanded the case for a new hearing after Mr. Warner's representative alleged a constitutional defect in how the ALJ was appointed.[2] (Tr. at 10).

A second ALJ held a hearing on May 19, 2020. (Tr. at 10). In a written decision dated May 29, 2020 (a mere ten days after the hearing), the ALJ denied Mr. Warner's applications for benefits, finding that he was not disabled from the alleged onset date of January 1, 2013 through May 29, 2020 (the date of the ALJ's decision). (Tr. at 10-22). The Appeals Council declined to review the ALJ's decision. (Tr. at 1-4). Thus, the second ALJ's decision now stands as the final decision of the Commissioner.

For the reasons stated below, this Court should reverse the ALJ's decision and remand for further review.

---

[2] On July 16, 2018, the Acting Commissioner of the Social Security Administration ratified all ALJ appointments and approved them as her own under the Constitution. (Tr. at 10).

## II.  **The Commissioner's Decision:**

The ALJ found that Mr. Warner had not engaged in substantial gainful activity since the alleged onset date of January 1, 2013.[3] (Tr. at 12). At Step Two, the ALJ found that Mr. Warner had the following severe impairments: degenerative disc disease, osteoarthritis of the bilateral knees, mood disorder, anxiety disorder, post-traumatic stress disorder (PTSD), and personality disorder. (Tr. at 13).

After finding that Mr. Warner's impairments did not meet or equal a listed impairment (Tr. at 13), the ALJ determined that Mr. Warner had the residual functional capacity ("RFC") to perform work at the light exertional level, with additional limitations: (1) he can no more than occasionally stoop, crouch, crawl, and/or kneel; (2) he cannot climb ladders, ropers, or scaffolds; (3) he can no more than occasionally climb ramps and/or stairs; (4) he is able to perform work where interpersonal contact is limited (which is defined as interpersonal contact requiring a restricted degree of interaction, such as answering simple questions, responding appropriately to supervisors and coworkers, and where interaction with the public is

---

[3] The ALJ followed the required five-step analysis to determine: (1) whether the claimant was engaged in substantial gainful activity; (2) if not, whether the claimant had a severe impairment; (3) if so, whether the impairment (or combination of impairments) met or equaled a listed impairment (Listing); (4) if not, whether the impairment (or combination of impairments) prevented the claimant from performing past relevant work; and (5) if so, whether the impairment (or combination of impairments) prevented the claimant from performing any other jobs available in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g).

infrequent and not considered to be an essential job duty); (6) the complexity of tasks performed can be learned by demonstration or repetition within 30-days, the tasks contain few variables, and they require little judgment; and (7) the supervision required should be simple, direct, and concrete.

The ALJ determined that Mr. Warner was unable to perform any past relevant work. (Tr. at 20). At step five, the ALJ relied on the testimony of a Vocational Expert (VE) to find that, considering Mr. Warner's age, education, work experience, and RFC, jobs existed in significant numbers in the national economy that he could perform, such as cleaner and assembler. (Tr. at 21). Thus, the ALJ found that Mr. Warner was not disabled. *Id*.

### III.   Discussion:

A.   Standard of Review

The Court's function on review is to determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole and whether it is based on legal error. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015); *see also* 42 U.S.C. § 405(g). While "substantial evidence" is that which a reasonable mind might accept as adequate to support a conclusion, "substantial evidence on the record as a whole" requires a court to engage in a more scrutinizing analysis:

"[O]ur review is more than an examination of the record for the

existence of substantial evidence in support of the Commissioner's decision; we also take into account whatever in the record fairly detracts from that decision." Reversal is not warranted, however, "merely because substantial evidence would have supported an opposite decision."

*Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005) (citations omitted).

In clarifying the "substantial evidence" standard applicable to review of administrative decisions, the Supreme Court has explained: "And whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence . . . 'is more than a mere scintilla.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 59 S. Ct. 206, 217 (1938)). "It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*.

It is not the task of this Court to review the evidence and make an independent decision. Neither is it to reverse the decision of the ALJ because there is evidence in the record which contradicts his findings. The test is whether there is substantial evidence in the record as a whole which supports the decision of the ALJ. *Miller*, 784 F.3d at 477.

B.   Mr. Warner's Arguments on Appeal

Mr. Warner contends that substantial evidence does not support the ALJ's

decision to deny benefits. He argues that the ALJ did not properly evaluate the medical opinions of record, and that further development of the record was required. The Court agrees with Mr. Warner.

While Mr. Warner alleged difficulties related to osteoarthritis of the knees and lumbar degenerative disc disease, reversal is warranted based on a review of the evidence related to Mr. Warner's mental health issues. The following discussion is tailored thereto.[4]

Mr. Warner had a history of serious mental impairments. He treated with Dr. Stephen Broughton, a psychiatrist, for several years, up until early 2020. (Tr. 909-970). Dr. Broughton diagnosed major depressive disorder, severe, without psychotic features; anxiety disorder; PTSD; and borderline personality disorder, all with a diagnosis date of September 27, 2015. *Id*. Dr. Broughton's records were duplicative, with each note showing generally normal mental status examinations and conservative care with medication management. *Id*. However, Mr. Warner regularly saw therapists and nurses in Dr. Broughton's clinic:

At a visit with Penny Parham, LCSW, on March 28, 2018, Mr. Warner endorsed anxiety and panic attacks, and he had a constricted affect and depressed

---

[4] See *Noerper v. Saul*, 964 F.3d 738, 741 (8th Cir. 2020) ("Although our detailed discussion is targeted, we have considered the claimant's arguments and the record as a whole as to all of her impairments and their cumulative effect on her limitations.")

and anxious mood. (Tr. at 910-912). On April 3, 2018, Mr. Warner saw Diane Boyd, APRN, and he said that his anxiety medication did not help at all, although he was compliant. (Tr. at 912-916). Mr. Warner had noticed physical effects of his chronic worry, including grinding his teeth and clenching his jaw. *Id*. He said he was unable to shop due to panic that he experienced among crowds. *Id*.

On May 9, 2018, Mr. Warner told Ms. Parham that he had recent panic attacks, but was trying to stay busy to cope with his issues as best he could. (Tr. at 919-922). On July 22, 2018, Mr. Warner endorsed high levels of anxiety and depression, and said that he planned to go fishing with his teenage son to deal with his negative emotions. (Tr. at 922-924). At a visit on September 17, 2018, Mr. Warner stated that he had taken a three-week driving trip to California with a friend, but that his medications were not effective. (Tr. at 932-933). On January 18, 2019, Mr. Warner was rude to Ms. Parham in a session and said his anger was at a high level. (Tr. at 941-943). He was getting out of the house very little and his chest hurt. *Id*. Again, his affect was constricted and his mood was depressed and anxious. *Id*. At an April 15, 2019 visit with David Nanak, LPEI, MA, Mr. Warner appeared to be somewhat improved and was not having as much trouble with chronic insomnia. (Tr. at 950).

On May 13, 2019, at another therapy session, Mr. Warner appeared alert and oriented, but said that his brain "never shuts down." (Tr. at 954-960). Mr. Nanak

wrote that Mr. Warner was "finding ways to tolerate a terrible situation." *Id*. On August 21, 2019, Mr. Warner reported excessive worry and PTSD flashbacks, with insomnia and suicidal ideation. (Tr. at 969). In January 2020, Mr. Warner stated that he was delusional, and that he thought he was a priest. (Tr. at 970-972). He had his friends take his guns out of his house due to thoughts of suicide (he had placed a gun in his mouth). *Id*.

At the hearing on May 19, 2020, Mr. Warner said that his anxiety was very problematic, and he hated being around crowds. (Tr. at 976-986). He said that due to cognitive issues arising from multiple head injuries, he had poor memory and concentration. *Id*. He would wake up 4 or 5 times a month and not know which house he was in, which he said was scary. *Id*. He said that he had trouble remembering tasks and problems with taking his medications on schedule, so he needed reminders on his phone. *Id*. Notably, Mr. Warner told the ALJ that he had no difficulty getting along with people.[5]  *Id*. Mr. Warner also testified that medications were not helpful for his mental health symptoms. *Id*.

---

[5] The record indicates that Mr. Warner was fired from one job due to tardiness and absenteeism. (Tr. at 603-612). He was fired from another for getting into arguments with his boss and the boss's wife. *Id*. He was fired from another due to mental problems. *Id*. And he was fired from another job due to poor work performance. *Id*. The fact that he told the ALJ he did not have problems getting along with others lends support to Mr. Warner's claims of cognitive decline.

There were multiple medical opinions in the record, including some from reviewing state-agency medical experts, and a few from consultative examiners.[6] Daniel Irons, M.D., examined Mr. Warner on April 5, 2016. (Tr. at 611-616). Dr. Irons noted that Mr. Warner was despondent and had poor eye contact, as well as an inability to control his anger. *Id*. Dr. Irons discussed PTSD and anger management issues. *Id*. Dr. Irons suspected that Mr. Warner had a speech impediment and progressive severe cognitive decline, with a possible diagnosis of CTE from multiple instances of head trauma. *Id*. Dr. Irons concluded that Mr. Warner would have severe limitations in all manner of activity, both physical and mental. *Id*.

The ALJ ignored Dr. Irons' conclusions about mental problems, and gave the opinion partial weight.[7] (Tr. at 18-19). He only discussed Dr. Irons' physical findings, which did not suggest disabling impairments. *Id*. The ALJ stated that the

---

[6] It is important to note that there were no medical opinions or consultative examinations after 2016, four years before the end of the relevant-time period.

[7] While the Administration promulgated rules in 2017 amending how ALJs consider medical opinions, the old rules apply here because Mr. Warner initiated his application in 2015. Under the old rules, the ALJ assigns various amounts of weight to medical opinions based on a variety of factors, and if an opinion is rejected, reasons are necessary. *Ingram v. Chater*, 107 F. 3d 598, 602 (8th Cir. 1997); *Prince v. Bowen*, 894 F.2d 283 (8th Cir. 1990). It is the ALJ's function to resolve conflicts among the various treating and examining physicians, and to explain his analysis. *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007)(quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001)). Failure to meaningfully discuss relevant portions of an opinion means that the ALJ has not "shown his work." *Smajic v. Berryhill*, 2019 U.S. Dist. LEXIS 6240 at *11-12 (E.D. Mo. Jan. 14, 2019).

opinion was vague, and thus, less persuasive. *Id*. An ALJ is not allowed to ignore relevant parts of a medical opinion, especially when a record of consistent treatment for serious conditions supports the opinion.

No less than five times in the ALJ's decision, he referenced Mr. Warner's ability to perform some daily activities (with breaks), and he leaned heavily on that one factor to discount Mr. Warner's obvious difficulties. (Tr. at 13-20). He also noted some relatively normal mental status examinations, when Mr. Warner said that he was somewhat improved. *Id*.

The Eighth Circuit has observed that "it is inherent in psychotic illnesses that periods of remission will occur,'" and that such remission does not mean that the disability has ceased. *Miller v. Heckler*, 756 F.2d 679, 681 n.2 (8th Cir. 1985) (per curiam) (quoting *Dreste v. Heckler*, 741 F.2d 224, 226 n.2 (8th Cir. 1984) (per curiam)). Indeed, "one characteristic of mental illness is the presence of occasional symptom-free periods." *Poulin v. Bowen*, 260 U.S. App. D.C. 142, 817 F.2d 865, 875 (D.C. Cir. 1987).

"Although the mere existence of symptom-free periods may negate a finding of disability when a physical ailment is alleged, symptom-free intervals do not necessarily compel such a finding when a mental disorder is the basis of a claim." *Andler v. Chater*, 100 F.3d 1389, 1393 (8th Cir. 1996); *Bland v. Saul*, NO.

2:18CV00095-NAB, 2020 U.S. Dist. LEXIS 69839 *23 (E.D. Mo. April 21, 2020) (ALJ decision to deny benefits reversed). Unlike many physical impairments, it is extremely difficult to predict the course of mental illness. *Id*. Symptom-free intervals and brief remissions are generally of uncertain duration and marked by the impending possibility of relapse. *Id*.

The ALJ in this case relied on evidence of moments of calm in Mr. Warner's life, apparently failing to appreciate the complex and chronic nature of his mental impairments. Moreover, Mr. Warner, who was noted to be compliant with his medications, tried to stay active and get outside to mitigate his symptoms, engaging in therapeutic tools recommended by his providers. The Court credits these attempts by Mr. Warner.

The Administration's own regulations state that: "In cases involving chronic mental disorders, overt symptomatology may be controlled or attenuated by psychosocial factors such as highly structured and supportive settings that may greatly reduce the mental demands on the claimant. With lowered mental demands, overt symptoms and signs of the underlying mental disorder may be minimized, but the ability to function outside of a structured or supportive setting may not have changed. See 20 C.F.R. Part 401, Subpt. P, App. 1, 12.00(F). The claimant may still try to work (like Mr. Warner did) and live a normal life, but he may be more impaired

that his symptoms indicate.[8]

The ALJ failed to properly analyze Dr. Irons' opinion, and he omitted important portions of the opinion from his discussion. Also, since the last medical opinion issued in 2016 and much of Mr. Warner's mental health treatment occurred in 2018 and 2019, an additional consultative opinion should have been obtained by the ALJ. These two errors warrant reversal.

### III.  Conclusion:

For the reasons stated above, the Court finds that the ALJ's decision is not supported by substantial evidence. The ALJ did not properly analyze or discuss the medical opinion of Dr. Irons, and his review of other medical opinions was also insufficient. Also, the ALJ should have further developed the record.

IT IS THEREFORE RECOMMENDED that the Commissioner's decision be REVERSED and the case be REMANDED for further review.

---

[8] As Judge Jerome Kearney observed in a 2017 case with a similar fact pattern: "A sufferer of [severe] mental illnesses cannot simply 'choose' to be happy, or to sleep more soundly, or to have less panic attacks, or to stop having PTSD nightmares, or to mend destructive personal relationships, or to escape from a cycle of violence, or to stop racing thoughts and hallucinations, or to eat more to maintain weight, or to complete tasks in a timely manner, or to cease addictive behaviors, or to stop crying all the time." *Judkins v. SSA*, NO. 4:16CV00392, *25 (E.D. Ark. Sept. 8, 2017). In that case, multiple ALJs committed multiple obvious errors over the decade-long course of Ms. Judkins's application process, and the Court ordered an immediate award of benefits, which is an extraordinary remedy.

DATED this 4th day of May, 2022.

_____
UNITED STATES MAGISTRATE JUDGE